UNITED STATES *v.* PACIFIC OVERSEAS CO., W. J. BYRNES & CO. (No. 4771) [1]

United States Court of Customs and Patent Appeals, April 9, 1954

[1] C. A. D. 559

**2**

*Warren E. Burger*, Assistant Attorney General (*Richard F. Weeks* and *Richard E. FitzGibbon*, special attorneys, of counsel), for the United States.
*Lawrence, Tuttle & Harper* (*George R. Tuttle* of counsel) for appellee.

[Oral argument December 10, 1953, by Mr. FitzGibbon and Mr. Tuttle]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, Second Division, pursuant to its decision, C. D. 1496, one judge dissenting, sustaining the protest of the importers, appellees herein. The initial action was directed against the classification and assessment of duties by the Collector of Customs at the port of Los Angeles on two types of imported linoleum, but was subsequently limited to the single type hereinafter discussed.

The linoleum in issue, invoiced as "3rd Gauge Sheet Marble," was classified as "inlaid linoleum" and duty assessed at the rate of 25 per centum ad valorem under the provisions of paragraph 1020 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. The importers contended that the merchandise was properly classifiable thereunder as "All other" linoleum at 15 per centum ad valorem. A majority of the court sustained that contention.

The linoleum involved has an over-all marbleized appearance resulting from the intermingling of color tones of tan, brown, green, gray, and white. None of the colors extend vertically from the surface to the backing. It was referred to in the deposition of one Edward N. Barran, Director in charge of sales of the Linoleum Manufacturing Co., Ltd., the English manufacturer of the goods in issue. His description of the method of manufacture coincides generally with that employed in this country. The process is described as follows:

Linoleum in general is produced by using dried or oxidized linseed oil which has been combined, under heat, with resins to act as the binding agent for powdered cork, or powdered wood, and such pigments or inorganic fillers as are required to produce the desired color. This oxidized linseed oil, when combined with resins, is known in the industry as linoleum cement. The linoleum cement is mixed with the powdered cork, or wood flour, and the pigments to form a plasticised mass, which is then passed through heavy rollers known as calenders, to form a sheet of the required thickness. This sheet is usually keyed on to a hessian or burlap backing. It may, however, equally well be keyed on to an impregnated felt paper. The simplest form of linoleum is plain linoleum; but by varying treatments of the plasticised mass before it has been calendered, other effects can be achieved.

Also in evidence is a square of linoleum which is concededly inlaid. The manner of its production is as follows:

\* \* \* Inlaid linoleum is produced by reducing the plasticised mass to fine granules which can then be run through a stencil on to the burlap back. The granules take the form of the stencil and, although two colors are usually mixed to go through one stencil plate, it is by no means necessary. After being deposited on the burlap back, the sheet passes through a heavy calender which consolidates the granules without distorting them. There is, therefore, no directional bias in inlaid patterns, \* \* \*. The formation of the granules goes right through to the burlap backing.

The importers contend that the calendering and cross-calendering of a granulated plasticised mass does not result in the production of lineoleum which comes within the common meaning of the tariff term "inlaid linoleum," and, therefore, it must fall within the alternate provision for "All other" linoleum; that the essential characteristic of inlaid linoleum, as in other inlaid articles, is the fitting into a background material other materials of different shapes and appearances, possessing a decorative effect; and, finally, that pattern penetration from the surface to the backing is but an incidental and not a determinative characteristic of inlaid linoleum.

The Government argues that the sole criterion for the determination of inlaid linoleum within the common meaning of the term is whether the color scheme or pattern penetrates from the surface to the backing; that the process employed in its production is immaterial; and that since the merchandise at bar possesses the characteristic of color penetration throughout, it is inlaid linoleum within the common meaning or, in the alternative, that the evidence submitted establishes a commercial meaning for the goods as inlaid linoleum.

In support of its protest the importers introduced the deposition referred to above and rested.

The Government presented the testimony of three witnesses and introduced in evidence a trade catalogue.

The trial court, in a very thorough consideration of the issues involved, examined numerous authorities on the subject of linoleum, cited certain judicial interpretations of the term "inlaid," and discussed a number of cases relating to the measure of proof required to establish a commercial meaning as distinguished from the common meaning. It held that the merchandise did not come within the common meaning and, applying the standards found in the latter cases, also held that the proof submitted by the Government was not sufficient to establish a commercial meaning.

In determining whether the trial court committed reversible error, as alleged by appellant, reference is made to the definition found in Webster's New International Dictionary, Second Edition:

inlay \* \* \* 1. To set into the body of a surface or ground material; as, to *inlay* arabesques; also, to pattern or adorn (a surface or ground) by the insertion of other material; as, to *inlay* a panel with lilies; to adorn by inlaying (with); as, to inlay wood with mother-of-pearl.

In the Encyclopaedia Britannica is found the following discussion on linoleum:

Linoleum can be divided into two broad classes: (a) Plains, and (b) inlaids. These can again be further sub-divided, from the manufacturing point of view, into—(1) Plains, Printed, Jaspés, Granites and Moires. (2) Inlaids—Moulded, Straight-line, Granites, Parquetries and Marbles.

Plain and Printed Linoleums.—The granulated material is calendered on to the canvas backing by heavy steam-heated rolls. The same type of material is used for plain and printed goods, but the latter are usually thinner, and have the pattern printed on in oil colours afterwards. Granites, Jaspés and Moires are, with modifications, made in the same way, the variously coloured scratched materials being blended before calendering. * * *

Inlaid Linoleum.—When produced by the moulding process, the granulated material of different colours is sifted through stencils on to canvas lying on a table. A separate stencil, having perforations corresponding to the desired position in the pattern, is used for each colour, the scratched material being thrown on and the perforations filled. The completed pattern is afterwards put through a flat hydraulic "making press," to consolidate it, and the face is perfected by passing through a "finishing press." This method gives a very fine carpet and floral effects.

Straight-line Inlaids.—For these two processes are used. (a) Hand-made: the stencils in the moulding process are in this case replaced by pieces of previously sheeted material, cut to the desired shape, and laid on to form the pattern required. The rest of the operations are as in the moulding process. Parquetries, Marbles and Tile patterns are made in this way. (b) Machine-made: in this process the scratched material is rolled into a continuous sheet, and led, together with the backing, under a revolving "cutting cylinder." In the periphery of the cylinder steel knives are embedded, forming a complete pattern. Between the knives plungers operate selectively from the inside and place on the canvas the tesserae of the particular part of the pattern required. The pieces not required are carried round between the knives and are ejected.

The case of *Keveney* v. *United States*, 1 Ct. Cust. Appls. 101, T. D. 31111, cited with approval by the trial court, involved the classification, under paragraph 337 of the tariff act of 1897, of linoleum manufactured by the stencil process. In that case the court quoted the definition of "inlaid" as previously defined in *Hunter* v. *United States*, 121 Fed. 207, as follows:

"Inlaid" means laid into a definite space, as a separate part of the material of the structure; and the product is of a higher grade of manufacture, on which the higher duty appears to be laid.

While the Government does not seem to agree with the conclusion of the trial court as to the common meaning of the term, it argues in the alternative that the evidence is sufficient to establish that the term "inlaid linoleum" has a different meaning in the language of commerce.

In that connection it would seem that the case of *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T. D. 42641, is pertinent. There it was said that

Commercial designation is a thing often claimed in customs litigation and rarely established. The rule of commercial designation was never intended, as

has been often said, to apply to cases where some portion of the trade use a certain trade practice or nomenclature, but was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted. There was never any other reason for the rule.

In taking its position, the Government necessarily assumes the burden of proof prescribed by cases involving commercial designation. For example, in *United States* v. *M. J. Brandenstein & Co.*, 17 C. C. P. A. (Customs) 480, T. D. 43941, this court stated

* * * It is incumbent upon a party who asserts that a tariff term has a commercial meaning different from its common meaning to establish that fact by a preponderance of the evidence. Furthermore, if it is to control the classification of imported merchandise, such commercial meaning must be definite, uniform, and general, and not local, partial, or personal. These principles have been stated and restated by this court on many occasions, and we deem it unnecessary to cite authorities in support of them.

The Government presented the testimony of three witnesses. The first was one William J. O'Hara. He testified that he began work in 1922 with Congoleum-Nairn, Inc. as a salesman and continued in that capacity for approximately sixteen years during which period he covered the six New England states. He gave no testimony as to any other sales experience prior to 1930 and was not, as properly held by the trial court, qualified to give testimony as to the commercial meaning of the involved term at or immediately prior to June 17, 1930,[1] in any part of the United States other than the New England section.

The second witness, one Wilbur Newman, testified that he began selling linoleum for the W. & J. Sloane company in 1928, covering the territory of "Chicago, Wisconsin, Minnesota, Missouri, Kansas, Iowa, Nebraska, North Dakota, and Illinois." He added that "I've always been on the west coast in later years and also in the south." We are as puzzled as was the trial court what the witness meant by the latter language. We hardly see how it can be seriously argued that he was qualified to testify to anything more than his own experience during the two years prior to 1930 in the eight states mentioned.

The final witness, one Samuel O. Sixsmith, testified (in 1951) that he had been with Congoleum-Nairn, Inc. for more than thirty years and that during the first twenty years he sold linoleum in the "16 states which are in the northern part of the United States, and the District of Columbia." As pointed out by the trial court, the witness did not volunteer nor was he asked to identify those states. We are disposed to agree with the assumption of the trial court that those states may or may not have been covered by the other two witnesses.

A careful examination of the record convinces us that all of the evidence submitted by the Government, including the 1930 trade

[1] Date of enactment of the Tariff Act of 1930.

catalogue of the Congoleum-Nairn Co. has been accorded full weight by the trial court. Indeed, as we analyze the testimony, the court was more than generous in observing that "Totaling the territory in which the three witnesses who testified had sold linoleum on and prior to June 17, 1930, we have not more than 30 states at most, plus the District of Columbia."

It would seem that the following language in *Nylos Trading Company* v. *United States*, 37 C. C. P. A. (Customs) 71, C. A. D. 422, is apposite here:

\* \* \* Where the Government contends that an *eo nomine* designation in the tariff law is a commercial or trade term excluding merchandise the subject of a protest, it must prove that as used in commerce the term has a meaning which is *general*, extending over the entire country; *definite*, certain of understanding; and *uniform*, the same everywhere in the country. [Italics quoted.]

The judgment appealed from is *affirmed*.

JOHNSON, J., dissents.